Case 14-1126, Montford and Company, Inc., doing business as Montford Associates and Ernest V. Montford Sr. Petitioners, v. Security and Exchange Commission. Mr. Morris for the petitioners, Mr. Wiseman for the respondent.  The SEC lacked authority to file an action in this case. Contrary to the Commission's arguments in this case, Section 78d5 is not a mere expression of Congress's hope or aspiration or desire that the Commission would, in its discretion, complete timely investigations. Rather, it is a unique provision that sets concrete deadlines on the Commission to complete an investigation 180 days after Welles' notification is issued. And goes further and specifies that at the conclusion of that 180-day period, the Commission will either file an action or give notice that it is not filing an action. The consequence there is clear. The only exception to that is in subsection 2, which requires a complexity determination for the Division Director to extend the deadline. There's no dispute here that the SEC didn't file within the 180-day period. And there's no evidence in the record that the complexity determination has been made. Therefore, the Court should vacate the order. Well, I guess I want to go back, and I'm still not sure why we're talking about the 180-day rule at all, because you don't dispute at least that an extension decision was made. I know you have issues with the description of how it was made, but you don't dispute that one was made, do you? That an extension was purported to be... Decision was made. Yes. That's correct. They did purport to... Right. You don't dispute that an extension decision was made before the 180 days ran out. Correct. Okay. But I'm not sure why we're talking about 180... because once an extension decision is made, then the 180-day bar goes by the side, and you have the new time limit in the extension decision. So it seems to me your real argument here has to be there was something wrong with that extension decision. And unless we decide that, we don't even get to the 180-day issue, do we? Well, it has to be a proper extension under the statute. Right. But I'm just saying if we... don't we have to decide that before we can even address the status of the 180-day period? Well, I think the Commission's argument all along has been it has discretion under Section 1. If an extension is given, it has to be according to Subsection 2 in our view. And that's because Subsection 1 cabins in the Commission's authority. So I think that predicate has to be there. And that's a dispute that we have with the Commission. But, too, the extension here wasn't proper. And so whether the court does it A or B, either way, it wasn't proper. In fact, you say it wasn't proper because... They didn't make the prerequisite termination. They didn't make it or they didn't articulate it one way or the other, right? In the evidence. There's nothing in the evidence. And they don't dispute there's any evidence that it was made. They have a declaration, and it omits the one statutory prerequisite for that extension, which is that it was sufficiently complex. They do contend a complexity determination was made. They just say that it wasn't... there wasn't a written reason given. Or they haven't proffered that in the record. They haven't articulated anywhere that the complexity determination has been made. Their argument is... I thought they had. They said that we don't see it quite as parsed out as you do. I think they've said we, in granting the extension, we grant the extension according to the relevant standard, which is that this was a complex case that warranted more time. They don't, in fact, say that. What they say is that the commission and or the court can presume, under the presumption of regularity, that that statutory prerequisite is there. Wouldn't we have to decide that evidencing that judgment or articulating that judgment is itself jurisdictional for you to win? Because it could be that the time... even assuming you're correct that the time period is jurisdictional, that doesn't mean that an articulation requirement's tied to an extension. It's itself jurisdictional. That has to have its own jurisdictional status, doesn't it? Well, the articulation... they do argue that there's no requirement of articulation. We're not saying that the commission has to publish an order when it does this. The point being that, for instance, take R.H. Stern. In that case, when there has been the agency stepping out of line, as it has done, right, it filed after the 188A period. Under R.H. Stern, it says the presumption then and the burden goes to the government to show why it was appropriate in that case. At that instance, it then has to show that it complied with what the statute requires at that point. Under subsection 2, it requires a determination that a case was sufficiently complex, and they exercise their discretion. Is that a jurisdictional determination? Does jurisdiction hinge on them finding and articulating complexity? It hinges on the complexity determination being made. If they've not complied with subsection 1, then the only way in which they can file after that 188A period is through subsection 2. So that would have to be jurisdictional, too, for you to win. Correct. I just wanted to follow back on you said they don't say that they made a complexity determination. They rely on the presumption of regularity. But I see those things as actually completely consistent in the sense that when you rely on a presumption of regularity, you say, yes, we did this. We're entitled to a presumption that we did it. So the presumption of regularity is an evidentiary rule. It's not a blank check to the government that they don't actually have to behave regularly because we counterfactually assume that they do. It's quite the opposite. It's that they're saying, yes, of course we did this. We read the law. We understood. We made a determination maybe in a meeting, you know, in the consultation about whether to seek the extra time. We did make a complexity determination. And so I think your position has to be driven by, you know, an understanding that because of the demands of administrative law, judicial reviewability, there has to be something memorialized on that. But I don't take them to be arguing, and I'm not sure whether you're arguing, that no complexity determination at all was made here. Well, we have no evidence whether or not the complexity determination has been made. That's a different point than saying that they don't dispute the no complexity determination. I don't take that to be significant. Right. But there's nothing in the record that it was made. The only declaration omits that determination was ever made, and so they fall back to the presumption of regularity in order to fill that gap. As an evidentiary matter. As an evidentiary matter. But the point is that under R.H. Stern, when the government steps out of bounds, as it did by violating subsection 1 and not filing in the 180-day period, the burden then goes to the government, and their only declaration omits the one thing that they had to do under subsection 2. Well, if I can assume you're right about subsection 2, is it a given that the subsection 180 days is a jurisdictional limitation? I mean, in light of Casey's Supreme Court law, Brock, that has not this statute but a different 180-day limitation, said that the consequence is not spelled out as being jurisdictional in the statute, that it's not necessarily jurisdictional. Well, right. The consequences have to be stated. But there's no explicit or ‑‑ There's a kind of split between what's stated here. Well, it doesn't require an explicit statement of no jurisdiction. It's an undertaking of statutory interpretation given the normal indicia of congressional intent, and that's clear here. But, I mean, we have legion's authority both in our court and in the Supreme Court viewing this kind of deadline as directory rather than mandatory, and ‑‑ Not under this kind of provision. I mean, the closest analogy here would be if Congress had said commission has to complete an investigation within 180 days. That's closer to the cases that they rely upon, complete an investigation in 180 days. But that's not what this says. The title of it is a deadline for completing an investigation, but this provision itself then specifies what happens at the end of that, which is they either file an action or give notice that they're not filing an action. And that right there, it spells out exactly what's going to happen at the conclusion of that period. Just yesterday, the Supreme Court reminded us that statute ‑‑ that time limitations in statutes are presumptively nonjurisdictional. And in that statute, it said file it within X days or it shall be forever barred. And that wasn't enough to make it jurisdictional. And so how is this stronger than that case? They were dealing with divesting an article through tribunal of authority in a case and didn't rely on any of the same precedent we're talking about here, which we're talking about an independent agency that only derives power from what Congress grants to it. And when it doesn't grant, it doesn't have the authority. Well, we only derive power from what Congress grants to us as well. And so I'm not sure why that's a distinction. This is about how you construe statutes that limit courts or agencies. And it would be a little hard to say a time limit that says it is violated shall be forever barred is nonjurisdictional, and then to have something here that doesn't have anything near that language be jurisdictional. We'd be happy to submit a letter on the impact of that Supreme Court decision, which came out yesterday, and further elucidate it. One of the things you made, and it's a good point, this isn't just a time limit, it's an either-or with an extension. And the or is either file or inform the director that you're not filing. Correct. So let's say they inform the director they're not filing, and the director says, I disagree. Are they violated the statute? They've done exactly what the statute says. If they go to subsection 2? No, they don't have to. It says either file or tell the director. It doesn't say the director has to do anything. But the time limit is there. No, the time limit is on them to either file or tell the director. There's no time limit on the director. But I see. I mean, correct me if I'm wrong, but I don't see any time limit on the director. Provide notice to the director. Right. Subsection 2 makes clear, though, that the exception to that, the 188A window, is if there's an extension determination. No, it's not. Because it's not that the commission shall file. It's that commission staff, which is a little unusual, commission staff, not the commission shall file or commission staff shall provide notice to the director. I mean, it really seems like, so the question is, what is this trying to accomplish? And, you know, one thing it clearly was trying to accomplish is to make this agency more prompt and effective in getting its work done. And you also point out in your brief a separate interest, which is basically the repose interest of a target of investigation. Yep. And, you know, question whether that's really adequately supported in the congressional materials that you cite. But wouldn't it be the case, if that were the interest, that this determination or not would have to be something made public? There's no requirement that this be communicated. No, but the session itself gives repose to the target of the investigation. If you read that and note that after the 188A period that if there's no action filed. But then you wouldn't know because it's completely internal. Maybe they cited an extension based on complexity. Gee, I don't know. I got the Wells notice. And you would think that if this was about repose and if that were the driving rationale, which it seems to me is your main sort of logic for reading this as jurisdictional, that along with not acting would be some notice to the target of the investigation, your case is closed. But there was no discussion of that anywhere in the legislation that created this timeline. Agreed if that were the only purpose for it. Even if it were an important purpose. Setting aside that, another important purpose of the provision was to put real deadlines on the agency, which was basically dysfunctional prior to this point. The whole point behind Dodd-Frank was to make a more effective agency in conducting business. And a big problem prior to this was lingering investigations, not closing investigations, letting them go on forever. And so it's clear you read it against that background. This provision is meant to either you make an action or by the passage of time it's closed. But I guess I get that. I understand that argument. It's a fair argument. But it seems like the way it's written is to make commission staff keep moving this up the chain internally. Staff take it to the director and do that with either file or take it to the director within 180 days. So that gets it up to the director's attention. And then if you want another 180 days, you have to go bother those commissioners. And they have to move on the extension. I bet you commissioners aren't real happy to have to deal with extension motions. They've got more important things to do. And so it's take it to director, take it to the commission. And so it seems like an internal push within the agency rather than an external repose for a target investigation. Undoubtedly, a big part of the purpose for this is to put pressure on the agency. But a big part of that is to actually have consequences. If they can just keep kicking it down the road, that's not solving anything that Congress set out to do in this provision. It's just continuing to kick down the road. And so it has to mean something that at the end, conclusion of the 180 days, unless that is jurisdictional. And I see I'm out of time. And we'll press the commission on that. But I think you also may underestimate the incentives created by shame internally. I mean, even judges have, you know, timelines, 60-day lists, you know. And they're not going to close the cases or, you know, sanction the judge for failing to meet them. But it really is something that people pay attention to and does move the work along. And it seems like it's a natural way to read this is that it's creating a similar scheme. I see your time is up, but I actually did want to ask you about your argument on the merits. And just if you could sort of give us a succinct statement of why you think that there's a failure of causation or that the claim on the merits doesn't stand up. Well, the causation argument basically comes down to there's no evidence that the failure to disclose a conflict of interest caused the payments. You're making the discouragement, not the penalty argument right now? Yes. Okay. Yeah. There's no evidence that it caused the payments. The work had been done or substantially done, even according to JA-299, where the commission says that the work, the communications with the clients all happened prior to about mid-August. So the work and transferring was largely undertaken. It's only at the end of August where it basically says, I've done enough work here that essentially I need some kind of recompense because it's taken a lot more work than was required. What is the causal standard? How is it articulated between the illicit activity and discouragement? It's not but for causation. I'm not sure it's even proximate causation. What is it? Did it cause? See, I saw causally connected or attributed to, which sounds, actually, I'm not sure causally connected is actually causation. I'm just asking, I'm asking what authority, is there a case somewhere that has said it is an actual causal requirement, at which point then we have to ask about but for approximate? But I believe in our brief we cited in the cases where it is a causal standard attributed. Because what the nature of the relationship is is very important. And if it's causally connected or attributable to, that's pretty soft. If it's but for, that's a pretty hard one. Well, attributed to, I think, is a articulation of it. Causally connected is another. But the point is. Is that softer than but for approximate causation? I don't believe so. Which is it then? But for approximate. At a minimum. But for causation. Seems like the appropriate one. Whether there are elements that might cut it off at some point is a separate question. But there's no connection between these at all. The disclosure violation and the payments themselves. There's no evidence that one basically was linked to the other. What evidence is there as to the time that the money moved into the SJK account? Because I take it this. Right, later. Correct. But there's always an obligation to disclose. Correct. Well, there was an obligation. Even though the actual transfer came after the clients of your client had been induced to move their money into the funds of funds handling. Even though that happened first, they still had an obligation. Your client still had an obligation to disclose. Well, we're not really as independent as we've been letting on. We took money from this fund-to-funds operator that we advised you to put money with. Right. But the failure to disclose a conflict of interest to his clients didn't have anything to do with the request for compensation for the work done prior to that point. That work came and was done prior to that point. Well, although the actual transfer of the money was, it's not really possible to say when the incentive to fail to disclose first was in the mind of your client. As far as we know, they were going to get this money all the time. It was always the plan. As far as we know, they planned not to disclose all the time. That's the trouble with your non-disclosure. It doesn't tell us anything. Well, but there's no evidence that there was any kind of plan before. No, there never would be any evidence unless somebody wanted to roll over. But he didn't get the amount of money he was going to get. It wasn't decided until after. Correct. The money all came in. Doesn't that suggest that, okay, well, we're going to have a relationship, and I'm going to give you something, but no amount set right now. And then the money starts flowing in, and ah-ha, have $210,000. I don't understand how that's not causally connected. The failure to disclose to the clients in August that, ah-ha, now I'm going to be getting money from this guy, is what caused them to put their assumption that this was all above level, he wasn't getting paid by this guy. They've said it's a factor, and what let them have their money in, and then their money's all in, and he goes, you know what? You have earned $210,000. Does that ordering not work? No. The $210,000 came from the work that he'd done in transferring the client funds based on his recommendation prior to that point. There's no conflict of it. Agreed that there was a conflict that arose that he had to disclose. But under the SEC's own rationale, the conflict arose when he requested the money, not based on certain amounts. Well, it arose and it kept going. I mean, he had a duty to amend, and the conflict continued every day and every minute between August and until it was all finally stopped, didn't it? Well, he had to change his forms, correct, yes, and disclose to the client. I'm just having trouble even understanding your argument, because isn't it typical when somebody is being essentially bribed to do work, they get money and then they deliver, and there's a quid pro quo, and you're saying, well, the fact that they got the money before they delivered, before they, you know, induced the clients to come over, means that there was no causal relationship. But I thought that was kind of the way it worked, in that if he didn't deliver, then, you know, he'd be in trouble with Mr. Kolowoski. Those are assertions made by the SEC, and it's brief, but there's no evidence of any kind of quid pro quo or anything to keep it secret. But there's evidence that he's insisting that he's neutral, that he takes no money from anyone. Correct. Right. As an independent advisor, that was how he explained his services, that he was doing it. Well, I don't understand what you just said. I'm sorry to interrupt. What did you just say? As an independent advisor, he told his clients that he was independent. Yes. Okay. And he didn't tell them, I'm over here helping this person that I'm giving you advice to put your money with. Right? Correct. That he was transferring. I'm not sure how that was responsive to. Well, the point is, the only evidence in the record is from Mr. Montford himself. It's unrebutted, and it establishes that Kolowoski was closing his account with Phoenix. He was starting a new business, and Phoenix wasn't doing fund-to-funds. They needed to get the clients over to SJK and invest there in the fund-to-funds, which is what he recommended. Because Phoenix wasn't doing that, he offered to do the process. The process took far longer, and it was more intensive than he did. So he provides the person power and does the work and then says, hey, we've been administratively out of pocket. Help us out here. But both before and after, Mr. Montford is representing to his clients, I take no money from anyone that I'm recommending you invest. Both before and after. And so I don't understand where your chronology argument rests. He's denying it, whether he's denying it before and then getting paid, or now he's been paid and he's still denying it. He's not denying it. He's failing to disclose. Correct. Right. But in fact, he's been denying it in some interviews. I mean, the entire record is not just his. He has clients that have testified. Right. And part of the theory that the SEC relies on is that the lynch is that the clients would not have retained him had he disclosed that part of it. But all that is is testimony that it was important to them and that they basically fired him after all of this came to light. But there's no evidence, no question directly to the point that says, would you have terminated him at that point? There's no evidence of that in the record. Well, he made it impossible to really establish that by his failure to disclose. I mean, if he had done, we don't know what would have happened if he had followed the law, if he had followed the regulations. If he had said, I'm not independent, I have a relationship with Kowalski or everything. We can't know what would have happened, but he's the one who made it impossible. The SEC could have asked the witnesses there, would you have retained his services at the time had you known? So you're pointing to the record. I'm sorry, were you finished answering that question? The SEC finds that Kowalski paid Monford in exchange for Monford directing clients to SJK. You know, you're recharacterizing. I understand, you know, I've read your brief and I understand your client's testimony that, no, I was doing that as payment for these administrative services, but they found otherwise. And is there a challenge to that evidentiary finding? I mean, I take you to be making a strictly legal argument about causation. Well, we do point out that there isn't substantial evidence to support that accusation in there. There's no testimony, again, other than Mr. Monford's unrebutted testimony about how the events unfolded in this case. I just want to make sure I'm understanding. I take it your argument is by some point in August they had agreed he was going to get money for these transitional services. And the money went into the accounts. How did the flow of the money into the accounts relate in time to that determination? It wasn't until November there was a second invoice given and funds at that point, and then it was approximately a year later where another amount was also given. Right. And since that came after, they'd already made this determination. But I guess I'm still not clear on what the answer is. But the determination of the amount of the payment came after money had started flowing into his accounts. I think if I've got the chronology right. If so, tell me if I've got the chronology wrong. And if I've got the chronology right, why isn't that independently sufficient? The amount? In terms of how much you're going to get from me. Well, my understanding of the SEC's theory is that the mere receipt of any amount would have created a conflict of interest. But the disgorgement is going to be the amount. I mean, they disgorged the amount. Correct. He said these services, that he, Kowalski, independently determined to be the value of these services, whatever the services rendered are, and the SEC has its view and you have yours. But the value determination by Kowalski was after the money flowed in. So why isn't that causal for disgorgement of that amount? No money was paid in August. Correct. But according to the government, that's when the conflict and the disclosure obligation erupted. And I think you don't dispute that it kept going, right? Correct. Right. And so it seems like there was another decision that was caused by the flow of funds, and that was you have earned $210,000. The value of your services is $210,000. That put the amount on it. But, again, the – I guess I'm asking why, as a matter of law, that second determination as to now that the stuff is all flowing, here's what I think you're worth doesn't count. Well, the causal standard ties to the wrongdoing, not necessarily the specific amount, right? It's got to be tied to the wrongdoing. The wrongdoing here is the failure to disclose. And that, according to the Commissioner, arose in August, at the end of August. But it kept going. It arose every day in August, in September, in October, in November, in December, in January, and through the 2010 filing, right? I guess I'm not understanding why we're only looking at August. That's what I'm not understanding. Why does your causal thing say I can only look at what he did for Kowalski before that August agreement? As I understand, that's when the conflict arose. It may have had that conflict about him for quite some time, but that's when the conflict arose and the disclosure obligation arose. We really can't look at that in escalation. You've got to look at the whole story here. And they were in a relationship for months before this, what you call the services rendered or the extra services or whatever. Maybe there is a point where you can clearly say there's certainly clearly a conflict here, but if you really get the picture, you've got to look behind it. You've got to look all the way back to what was going on before. They were in a relationship for a long period of time. He never disclosed it. They certainly should have disclosed it at least by the time he got the money. But before that, he was working on this, Kowalski's setting up his new business. He was involved in the process, and he never told his clients that he was. Well, that was for his clients. That was work done in order to transfer his clients over. It wasn't a relationship that they had, and it wasn't one where he was getting paid. And what did he say he got paid for by Kowalski? Transferring the funds. Right, but that request for payment. Are you saying now that he did get paid for transferring funds? Yeah. No, the request for payment didn't come until after, when more was done at that point than was required. Let me ask you this, Morris. If it were clear on the record that Mr. Monford accepted funds from Mr. Kowalski in exchange for Mr. Monford continuing to vigorously refer clients to SJK, that would be a violation of the act, no? Yeah. And so your argument is that the record doesn't support that that's what happened? Correct. Unless there are any further questions. Thank you. Thanks. May it please the Court. My name is Theodore Wyman, and I represent the Securities and Exchange Commission. I think the key flaw underlying Monford's argument is that he blurs the line between Commission staff and the Commission itself. Section 4E is directed at Commission staff and regulates the internal investigation process. It doesn't limit the Commission. It doesn't impose any obligations on the Commission, which is the party that would be filing any lawsuit or instituting proceedings. What case do you have where there was, the ones I saw all said, do something by this time. And this one is different. It says do this by the time or do that by the time or get an extension. Is there any other case that has those many, that sort of specification of here are your three options. Here's a time limit. You've got three options. Well, the closest case in that sense would be Montalvo Maria, which does provide for a continuance. It says that you should bring the probationer before the court within a certain number promptly, and the hearing should be held on the first appearance unless a continuance is sought, three days if it's by the government, five days if it's by the probationer. In that sense, that is an extension situation, and the court found that that wasn't a situation in which the power to hold the probationer was lost. And I think the fact that there's this extension process undermines the point, undermines the argument that this is jurisdictional. It's entirely within the commission's power to control the process, and it goes purely to the internal recommendation process whether to file an action. Commission staff doesn't have the authority to go to court and file an action without commission approval. It has to go to the director, make a recommendation. That's what the intent not to file is. It's purely a recommendation. And then the commission ultimately authorizes an action or not. And even if the decision is made not to recommend an action, even if the investigation is terminated, the termination letter makes clear, the governing rules make clear, that they can be reactivated at any time upon more evidence. So the whole process is not directed at filing in court or not filing in court. It's directed at you either file quickly or you get approval for continuing extensions. And I think... Is there not a practice of telling an individual who's a target of investigation when a decision has been made to stop investigating? And as you say, it's subject to further reopening. But is there a process of notifying? Yes, there is a termination letter. Again, the whole process is informal and discretionary. There's informal rules that have been instituted to govern this, and it's all within the discretion of the commission to ensure that the commission's cases and prejudice, things of that nature. But there is a termination letter. There's no statute requiring a termination letter. No, there's no statute. Is there a regulation? Or is this just internal policy? It's internal policy. So I think you could cite for that? Yeah. Well, it's in the enforcement manual online, I believe, has the... And they cite in their brief, it's... Okay. That's fine. Yeah. And I believe there's... Okay, I could also give you a cite. 17 CFR 2025D. And it says that in its discretion, the staff may advise the party of termination. But such advice may, if given, must in no way be construed as indicating that the party has been exonerated or that no action may ultimately result from staff's investigation of the particular matter. So there is a rule, but it's completely discretionary. Right. But I bet people are pretty happy to get those letters. Absolutely. And I think the whole statute is premised on the notion that the commission is trying to act professionally, will be following the normal investigative procedures, but the same holds true with respect to the extension. But let me press you a little bit on, you know, Mr. Morris' argument and the arguments in their brief about, you know, if it's not enforceable, if it's not jurisdictional, is it worth anything at all? Oh, it's absolutely... It's worth a lot. I mean, the... There's no external consequence, such as the loss of commission's power to proceed. But the internal consequences are just as Your Honor recognized. I mean, commission staff has to go to their boss and ask for a first extension. The division director has to approve it and notify the chairman. The second and any subsequent extension, they have to go to the full commission. And this does two things. First, it's a disincentive to commission staff to have a dilatory investigation because you keep having to notify your superiors that you're taking a long time. And secondly, it notifies the division director and the commission and ensures they're in the loop. They're aware that this is continuing and they can do something about it. And that's what this statute is directed at. The legislative history makes clear that this was to spur the commission to action, to ensure that wrongdoers don't fall through the cracks when there's a promising investigation. And that's why, starting with the Wells Notice, this process ensures that there's a speedy progression of the investigation. And again, the statute's only directed at the investigation. It terminates when there's a recommendation made. If there's a recommendation made not to file, the statute is no longer applicable. And then the division statute relies on the director of enforcement and the commission to promptly consider the recommendation and act as in the normal course of business. And has it helped? Well, in this case, Your Honor, I think it's very clear that the process was followed. This investigation took 187 days. Before the 180-day mark, the extension was requested. It was granted. And it only took seven additional days to file this. I know this is sort of outside the record, but just sort of anecdotally as a general matter, is the agency more on top of its work in completing these investigations in a more timely manner? Well, I can't speak to whether there's a difference between how they acted before and now, but I can tell you that I've talked to enforcement attorneys on this case and others, and they pay attention to this rule. They notify, they ask for extensions, and they're aware of this 180-day rule and the requirement to ask for more time. So this is something that is governing the commission's conduct, and I think it certainly is a reasonable way of ensuring that the investigations continue at a prompt pace. Do you have a view on whether we should decide the 180-day issue at all, given that an extension was obtained here? So really the only question is whether it was a valid extension? Well, I think either alternative is equally strong. This Court could decide it on the fact that it's not jurisdictional at all, so there's no need to dismiss the action. Or it could also – I'm not sure is that question even presented, because I don't think anyone argues that it's 180 days irregardless of extensions. I think it's 180 days unless extended. And so since we're in extension land, I'm just trying to figure out how the 180-day question is even presented. While one might think about that as part of context, I'm just trying to make sure we're not reaching out to decide something that's not actually presented by this case. Well, I think – I see Your Honor's point. I mean, the extension clearly would be the first line to see whether the statute was complied with. But again, that would be not irrelevant, but it would be beside the point if it didn't have an impact on the court's jurisdiction at all. So I think the Court could look at it either way, but could certainly resolve this on the very fact that the extension was granted. And I have to respond to – when the other side said there's no evidence – Just a moment on the jurisdictional question. Yes. You do in your brief say something we didn't ask your opposing counsel about, and that is that our review of the jurisdictional decision of the Commission is Chevron review under city of Arlington, so that all we'd have to find is they were reasonably interpreting their authority as opposed to saying we agree with how they interpreted it. I think that's absolutely right. And I don't think the Court needs to even go that far because it's just so clear that the Commission's interpretation is right. I don't think – it's not really reasonable. Don't fix that ditch today. Right. But yes, Chevron deference would apply here. And I don't think they argue otherwise. They suggest that there was an explicit direction not to file, but that's, of course, the recommendation not to file. Well, I thought they did argue otherwise in that the city of Arlington didn't apply to procedural irregularities. They argued that in their reply, I believe. My understanding – maybe I misinterpreted their argument, but my understanding was they were arguing that because the statute hasn't expressed consequence, you don't get into the ambiguity. There's no silence or ambiguity at all. But in any event, it would be unreasonable. I think that's how I interpreted their argument, but maybe I could have missed the nuance there. On the complexity determination, though, if the Court does resolve this on the extension, the fact is the ALJ determined that the complexity determination was made by the fact that the extension was granted. The ALJ, I believe, said that you could deduce the fact that the proper factor was considered by the fact that it's a prerequisite to granting the extension and the extension was granted. Are these extensions – my assumption is that these extensions are obviously not public determinations because you have investigations going on. Are they generally even written down, or are they done – if the statute doesn't specify, are they done orally, internally? It's a little hard to figure out if we're supposed to review something, but there's no documentation of the actual decision, how the process works. The statute doesn't require anything at all, obviously, and the Commission has discretion to implement. Well, it requires you to make a complexity determination, but it requires the making. Yes, make the determination, but it doesn't specify any findings, obviously, or any record that has been made. Certainly, in this case, there was testimony that it was made. There's nothing required as to a formal writing or anything of that nature. Is it your view that the complexity determination is – is it ever reviewable by a court? No, and they don't argue otherwise. They argue that the question of whether it was made is reviewable, but not the merits of it. And I think that part of it is right, that the merits of it are simply not reviewable. It's not merely an objective complexity determination that a court can really look at and say this is a complex case. It's whether the director determines in his subjective view that it's sufficiently complex that it can be completed within the time. Now, that requires looking at how complex it is and the abilities of the agency to commit resources and do it within the time. Even if it's somewhat simple, if it does not have resources to do it within the time, it's not sufficiently complex to require more time. And so I think that it's one of these situations where it requires consideration of agency resources, the attorneys to devote to the matter, and other aspects of the investigation. I can take you to another matter on which nothing may ultimately turn, but what was the original recommendation for the level of fines here, the penalty here? Well, the enforcement sought a lower level of fines, I think $25,000 versus $50,000. $25,000. Something like that. And what was the final decision on the penalty? Per violation, for two violations, the commission decided to set two violations. You know the total figure. What was it? $650,000, I believe. $650,000. It was $150,000 versus $500,000. It goes to the original enforcement provision recommendation of $50,000. It may not be anything turning on it, though, I believe. Is that usual for the commission to come out that much higher than the original recommendation? Well, obviously, the commission has the general overview of the entire record. Did I ask you this? I can't answer how usual it is. I know it does happen that the commission goes higher or lower. Was that recommendation made before or after the discovery of the second payment that he hadn't been? I believe it was made after discovery. You know, I'm not certain. I think it was after the second payment was discovered. But certainly it was before the entire evidence was put on before the ALJ. And the ALJ decided this was particularly egregious and judged the credibility of Montford, found him not credible, so made some additional determinations. And also aggravating, I think, the situation was that he received all the advisory fees. And certainly I think the commission could have sought the advisory fees, too, but didn't. But that's certainly another level of several hundred thousands of dollars that simply he made out with that he got for advice that wasn't independent when he said it was. So I think there's ample evidence supporting the amount that was given, which was, of course, well below the statutory maximum. I have a fact question for you. I'm sorry, but I did not see it in the briefs or the record. What was the date of the Wells letter? Everyone's fighting about 180 days, but no one told me the starting point. I'm sure you all agree on that. It's just there's an odd cap to be missing. Let me see if I have that with me. They should. Are Wells letters ever made public? I didn't see it in the public anyway. They're given to the party and not necessarily made public. But if they're enlisted security, the party is obligated to disclose that. Right. That's a way in which it may be made public. The corporation, for example. I was just curious about the date. Yeah, Your Honor is absolutely right. I should have that on hand. I trust you all that it was 187 days. Yeah, it's 187 days back from the date this was approved, which was I think August 23rd. September 7th is when the action was filed. So I assume that it was August 31st or something like that. All right. I'm sorry, Your Honor. I should have that. That's okay. At least I know it wasn't right in front of me and I missed it. On the causation question, what evidence did you put into the record that the payment was tied to money actually coming? Since they made this agreement in August before the money started flowing and he'd already done transitional work, what evidence did you have that it was contingent? Well, one thing I think is the invoices themselves, which said this was a marketing and syndication fee. I mean, his explanation was this was just for the administrative work in transferring things over. But the bill was for marketing and syndication, which is essentially getting clients over. I didn't get what the syndication meant. Well, I think syndication means expand. In this context. I looked it up to see how. What did he do that was syndication? I think the syndication was getting more. I think it meant in the sense of getting people involved in a joint venture together, you know, joining up for this fund. So I think that's the way to interpret it. But it certainly isn't administrative work, which is his explanation. So I think the very fact that the invoices said this is for essentially marketing and syndication, getting clients over. But Monfort, there was a change in what the invoices said. Did Monfort. Monfort described it as he did. He didn't use marketing and syndication. No. Initially he didn't. But then he changed it. He says it's Kowalski's direction. Sure. But, you know, obviously he didn't have to agree to that. And I think the fact that he did illustrates the nature of the transaction. And certainly that's enough evidence for the commission to believe that that is the nature of it. I think, you know, there's evidence that Kowalski was praising him for getting clients to transition over. There was an e-mail where Monfort said that they were discussing the payment. And Monfort said, by the way, I got another client. And he was like, great job. I mean, it's in the context of getting the clients over and getting the payment made. I think that's evidence as well. And also certainly the chronology of it all, that he made this agreement originally to get clients over. He then goes to work persuading them to. Midway through the transfers and the persuasion, he demands the payment. The payment matures into a request for two payments over time, not negotiated, not based on his administrative work, his time spent. It's purely set by Kowalski for the value of essentially the clients being the marketing and syndication. And over time, Monfort is essentially lying directly to certain clients and certainly omitting information to all of them and, again, firmly misrepresenting his independence. So I think all of that together makes it very clear that the payments were for getting the clients to move over. And certainly that's what the commission has expressed finding to that effect, that this was the purpose. The clients wouldn't have moved over if this had been disclosed. And essentially he was paid for the clients moving over. Ergo, the payments were essentially for the nondisclosure violation. That's how he received them, by virtue of the nondisclosure and the permanent investor representation. How exactly would you articulate the causal connection that needs to be here? It just says causally connected, and I wasn't sure. Well, I think the standard is a reasonable approximation of the profits causally connected to the violation. What does causally connected mean? Essentially it's the ill-gotten profits. It's what he gained, the ill-gotten gains by virtue. So is it but-for causation? You know, I don't know if it would – certainly at most it would be but-for causation. I think it's a little looser. It certainly is a reasonable approximation. And there's a causal connection. It doesn't require absolutely but-for. So I think it is a lesser standard, but certainly even the greater standard would be met here. Aren't the ill-gotten gains the points that Monford gets from SJK for the business referred? Or the points he gets from them for advising them? That would be ill-gotten gains as well, and that could have been. But that wasn't sought. It wasn't sought. I think it simply was an oversight. It should have been sought, or could have been sought at least. I can't make the value determination, but it could have been sought here. And enforcement staff decided to go for the bribes themselves, the kickbacks, excuse me. Where did the commission find kickbacks or that the payment turned on anything that happened after the August agreement as opposed to the stuff that was done before the August agreement? Sorry. Where did the commission find – because there's this mid-August agreement I'm going to get paid for the stuff I've done. He'd already done a fair amount of administrative stuff of that kind and, you know, cajoling clients into going forward. Sure. Where did – just help me find in the commission decision where specifically they said that the payments were for all the actual flow, the kickbacks that you now call it, that happened later as opposed to the stuff that was done before the August agreement. The commission, in its opinion, rejected the argument that these were administrative services. I'll find – I can find that. Yeah. They rejected that, but then I'm sure – And in that – Where they said the causation was the longer-term one as opposed to this was all for services rendered, whatever those services were, not administrative services rendered before August. Well, certainly the causal connection is connected to the nondisclosure of the – even aside from the kickbacks, the fact that he demanded the kickbacks alone creates the conflict of interest that must be disclosed. And that continued and amplifies – I don't think the commission used the word kickback anywhere. The commission – I don't know that it used the word kickback, but it said that it was payment for getting his clients to move over to SJK. It wasn't administrative. That was in its liability determination. Except they agreed to the payment before anybody moved, right? Well, while people were in the process of moving, he said – he was already doing the work. He said, I want to be paid for all this. I'm getting clients over, essentially. And that was when – That's what I couldn't find in the record was it wasn't clear to me, because there was this sort of vague July, August, September timeline, and it just wasn't clear to me whether money had started moving even before the August agreement. It isn't entirely clear. I believe – my understanding is – Does it need to be clear? Well, no, because the money – whether the money – essentially, the process of moving clients over took several months. And the record doesn't show when money was precisely transferred over. But, of course, even if it was transferred, it could have been withdrawn and it could have been changed. So I don't think merely if some of the money happened to flow before he demanded to be paid, I don't think that changes anything because if he had disclosed it, his clients would have the opportunity to say, wait a minute, I want my money back. I don't want this to go to SJK. And there was evidence in the record that this – the transfer process took several months, and it finished after he demanded payment, so the entire process of transfer. So I think that goes to the point that – How logistic or holistic the inquiry is. Right, right. How linear the inquiry is. I just wasn't – Right, well, I think the question – the causal connection is the profits that he received, his ill-gotten profits from the violation. So I think it's not necessarily tied to when the money was transferred to Montford or not. It's simply the conflict of interest arose as early as August 30, 2009, when he demanded payment. The money was transferred over. It could have been brought back. It could have been – the clients could have changed their mind. It had been transferred or they could have stopped the transfer. Either way, he got the payment because those clients moved to SJK and stayed with SJK and continued to stay with SJK for the second payment. So I think the fact is the nondisclosure predated all of that. The nondisclosure predated any receipt of the ill-gotten gains. And when he received that money, that was the payment for the nondisclosure violation, essentially for the fraud that led his clients to SJK through his nondisclosure. Any more questions? There's no more questions? Thank you. Mr. Morris, we'll give you a couple minutes, if you'd like, for rebuttal. Really, for your honors, just to pick up on a couple points, Montalvo, which is the one case that they said was similar to this, but that one was bring someone forthwith. It didn't have the same kind of language that we're talking about here, which is file, no file. Going to the internal consequences that will occur, they point to subsection 2 of 70AD5. That's the layout of how they're going to get extension processes and how it's going to move up the chain. But their reading of subsection 1 is it's not mandatory. In other words, it's discretionary whether they comply or don't comply with the 108 timeframe. So they don't need to go to subsection 2 under their reading of the statute. They can just basically blow the deadline, and it's more of a nice encouragement for them to carry along in their normal course of business. In responding to your question about whether or not you need it actually deciding subsection 1, the point is they didn't get a proper extension under subsection 2. The consequence then is, what does that mean? And that means? It wasn't proper because they didn't. There's no evidence in the record that they made the right determination. If they said we obtained the extension because it was substantially complex, you wouldn't be here at all. Yeah. So it's just that failure to articulate that. The failure of proof on that point. Well, wouldn't it even need to be more? It would need to be something susceptible of judicial review, so it would need to have some articulation of why it was deemed to be complex, no? Well, whether we can challenge the complexity determination wasn't raised below, and so we're in a position or a posture now where we can't really challenge whether or not that's reviewable. The point is it is a necessary prerequisite that that determination be made. Under R.H. Stern, it's fairly clear. If that necessary prerequisite is not itself jurisdictional, then doesn't your whole argument on the jurisdiction class? Because of Subsection 1. Subsection 1 says jurisdiction ends by failure to meet the 180-day deadline unless, and the only exception being under the structure, that it was extended properly under Subsection 2. I see my time is up. Did you want to say anything about discouragement quickly? I'm still very confused about the timeline and the causation standard. Causation standard, we would articulate it. I don't think the Court's cases have been especially clear on what exactly the causation standard, right? The way it was is the ill-gotten gains from the disclosure violation. In this case, I think had it been the advisory fees that were paid after the failure to disclose had gone forward, that sounds like that is ill-gotten gains from the failure to disclose. The payments made based on work done to transfer to a fund of funds, right, and that had substantially been undertaken. What about payments? The agreement to make the transfer had already been done, and it's only at the conclusion when it's clear that that is too much work that is then there is something there that. You're fighting a little bit with the record. In the joint appendix of 317, the commission says, Monfort twice admitted that SJK paid him, at least in part, to convince clients to stay with SJK. And your view of the facts is that the only reason that Monfort was ever paid was for these administrative services. And so you have both that, what the commission views as an admission. You have the invoices saying that they're for marketing. And so they're seeing the rationale as quite different. The only one that they were paid for moving anyone over is the invoices. I think that's the only thing that the commission points to. Why isn't that enough? Well, you have unrebutted testimony from Monfort, no one else explaining what's going on here, who said they were for these services. The initial invoice that was given, and I believe that's at JA 47, is for consulting fees for the initial one. It's only Kalowski who then says, for my tax purposes, please make it for this. He changes the invoice. And that's the only evidence we have on that. Does it make a tax difference? I mean, it's business expenses, isn't it, one way or the other? Yeah. I don't know. I doubt it makes any taxes. Why isn't it enough? That's the question you were asking a moment ago. Why isn't that sufficient evidence for us to do? It's speculation as to what exactly happened. There's nothing to bolster or explain that other than Monfort's unrebutted testimony. Why wasn't it enough? Now, Monfort's testimony is self-serving. It wasn't believed by the commission. They don't find it credible. So the evidence we have is the invoice. Why isn't that enough? It explains nothing as to whether or not he was convincing clients or what it was. For the rest of the record, it's not. It may be a true statement, but it's not an answer to the question of what's not enough. All right. I would go to, again, Monfort's unrebutted testimony. Unless there are any further questions. Thank you very much. Thank you. Case is submitted.
judges: Millett, Pillard, Sentelle